CHICAGO, ROCK ISLAND & TEXAS RAILWAY COMPANY v. J. M.
WILLIAMS.

Decided November 10, 1906.

1.—Personal Injuries—Release.

When a party executes a release of all claim for personal injuries, before he can avoid the same he must show not only that he was ignorant of the true nature and effect of the release executed by him, but that the want of knowledge in these respects was procured or induced by some act of the other party amounting to fraud.

2.—Same—Evidence.

In a case where the evidence showed that the plaintiff could read and write, that he well understood that he was settling his claim for personal injuries in consideration of his being paid one dollar and a half a day for the time lost by him, and it was also understood and agreed that twenty days would be ample time for his recovery, that the parties were mistaken in the length of time the plaintiff would be disabled would not of itself be sufficient to avoid the release.

Appeal from the District Court of Wise County. Tried below before Hon. J. W. Patterson.

*N. H. Lassiter, Robert Harrison* and *T. J. McMurray,* for appellant. —There is no evidence in this record that the claim agent, by his representations and acts, fraudulently and designedly led the plaintiff to believe that the release signed by him was only a receipt for thirty dollars and an agreement to accept $1.50 per day for the time he was unable to work. The evidence wholly fails to show any fraud or misrepresentation on the part of the claim agent, and it was error to submit this issue under the evidence in this record. Gulf, C. & S. F. Ry. Co. v. Fenn, 76 S. W. Rep., 597; McGee v. Verity, 71 S. W. Rep., 472; Hurt v. Wallace, 49 S. W. Rep., 675; Houston & T. C. Ry. Co. v. McCarty, 94 Texas, 301; May v. San Antonio & A. P. Townsite Co., 85 Texas, 504.

*R. E. Carswell,* for appellee.

CONNER, CHIEF JUSTICE.—On a former appeal a judgment in appellee's favor for damages for personal injuries was reversed by this court because of an erroneous charge in submitting issues relating to a release of the damages sought that had been executed by appellee and pleaded by appellant. See 83 S. W. Rep., 248. The evidence shows without dispute that the release in question is in form an unconditional and absolute release of the appellant company from all damages arising from the injuries made the basis of this suit  It is also undisputed that appellee executed the release as pleaded, but he alleges in avoidance thereof that the settlement made between himself and one of the appellant's agents was upon terms and conditions different from those stated in the release pleaded; that the release as pleaded had not been read by him, and that he had been prevented from reading it through the fraud and misrepresentation of appellant's said agent. This we deem to be the vital issue in this case. As stated by us on the former appeal,

"before he would be authorized to recover in this case the appellee will be required to show not only that he was ignorant of the true nature and effect of the release executed by him, but that the want of knowledge in these respects was procured or induced by some act of the appellant amounting to fraud. It is undisputed that appellee was able to read and could have read the instrument executed by him, and his failure to do so can only be excused by a replication of fraud upon the part of the company's representative." On this appeal it is insisted in various forms that the evidence wholly fails to relieve appellee from the effect of the release, and with this contention we feel that we must agree. Appellee has not favored us with a brief, but the evidence upon the issue under consideration as set out in the stenographic report is substantially as follows:

On plaintiff's examination as a witness: "Q. Now, just tell the jury all that happened when Mr. Williams, the claim agent, came to see you. A. Mr. Williams came to my house. Dr. Funk left on Wednesday, and Friday or Thursday Mr. Williams came; when he came to the door I had just got out of bed, had been up five or six or seven minutes; he came to the door, I think the north door; I think the north door was shut; I had just been out of bed five or six or seven minutes, when he came and knocked at the door. He came in and said, 'Good morning, Mr. Williams; I am glad to see you getting along as well as you are;' and I spoke to him and said, 'good morning, Mr. Williams, I am glad to be alive.' He sat down and we talked on other subjects, first one thing and then another; then he began talking about a settlement in about these words: 'Some one on the east side told me you were talking about suing us, and I thought I had better come by and see you.' I says, 'Mr. Williams, I never said a word in the world about suing the railroad; some that come in say I ought to have $50, some $100 and some $200; but I don't want to rob the railroad company, even if I could.' I says, 'All I want is my time; I am only getting $1.50 a day; that is all I would have got if I had not got hurt; all I ask, Mr. Williams, is to place me where I was; all I want is $1.50 a day until I get well; that is all I would have got if I had not got hurt.' 'Well,' he says, 'we are perfectly willing to do that,' and he got up and went back to the door where he had put his valise and got a paper; he said, 'I come by to see Dr. Funk this morning, and Dr. Funk says, 'On the last visit I told him he would be up in six or seven days,' but I will make it seven or eight days from now and make out your time for twenty days and give you a check for $30, to give you plenty of time to get well.' I says, 'Whenever I am well I am satisfied,' and I made the reply again, 'I don't want to rob a railroad company, even if I could.' He wrote out the contract and said, 'Sign right here.' and pointed where he wanted me to sign, and then he asked my wife to sign; she was a little timid about it, but I told her to sign it. After I signed it and Della signed it, he stayed a few minutes and left. Q. Is that all that happened between you and Mr. Williams? A. Yes. Q. You signed the voucher? A. Yes, I signed it. Q. Is that all that was said? A. That is all that I remember. Q. That is all that was said about this transaction? A. That is all I remember. Q. Mr. Williams gave you a check for $30 didn't he? A. Yes. Q. How long

did you keep the check before you cashed it? A. A day or two." It appears in statement of facts, page 40, that the witness could read, as he there read to the jury the release which he signed. On statement of facts, page 41, he was asked: "Q. Did you read it? A. No. sir. Q. Did Williams prevent you from reading it? A. No, sir, he didn't ask me to read it. Q. You didn't ask to read it? A. No, sir. Q. You didn't ask him to read it to you? A. No, sir." It appears on statement of facts, page 42, that the check, which he kept for two or three days before cashing, recited that it was "for release from injury received at Bridgeport February 12, 1903, while pinching a coal car off scales." Under direct examination by his counsel he again stated the conversation between him and Williams, as follows: "Q. What did Williams say while he was writing? A. He said he came by the doctor's, and he said on his last visit that I would be up in six or seven days, but he would make it for seven or eight days more and make out my time for twenty days and give me $30, and he said, 'that will give you plenty of time to get well.' I says, 'Mr. Williams, when I am well, I am satisfied.' He went over to the door and got the release out of his valise, and wrote a few minutes, and gave it to me and my wife to sign. He said, 'Sign right here,' and I took it and signed it. Q. Did he propose to read it to you? A. No, sir. Q. Did he explain what it was? A. No, sir, he never said a word about what it was; just brought it to me and pointed his finger on the line and said, 'Sign here.' Q. Did you ask him to read it? A. No, Sir.'"

Mrs. Williams, appellee's wife, testified as follows: "Q. Do you know this Mr. Williams, the claim agent? A. Yes. Q. Did he come to your house? A. Yes. Q. Do you recollect when it was? A. It was the 19th of February. Q. Was that the first time you ever saw him? A. Yes. Q. What occurred when he came? A. Mr. Williams came in and said, 'I am glad to see you getting along as you are,' and Mr. Williams said, 'I am glad I am alive, I run a narrow risk of getting killed.' Mr. Williams said, 'Some body on the south side said I had better come and see Mr. Williams as he was liable to sue us, but I said I knowed that man Williams.' My husband said, 'I did not say anything about suing the railroad company, I said that I thought they ought to give me $1.50 a day until I was well and pay my doctor's bills,' and Mr. Williams said they would agree to do that. Q. Who agreed to do it? A. The claim agent. Q. What did he do? A. He got up and went and got his papers and went to writing; he said, 'the doctor said you would be able to go to work in six or seven days, but I will make it seven or eight days longer and give you twenty days and give you a check for $30.' Q. What did Mr. Williams say? A. Why he says, 'When I am well, I am satisfied, at $1.50 a day.' Q. What did he do? A. He handed the paper to sign. Q. Handed it to whom? A. He handed it to Mr. Williams. Q. What did he say? A. He showed him where he wanted him to sign. Q. Did he say anything? A. If he said anything, I did not hear him, and I was sitting near. Q. Where were you? A. I was sitting there opposite the stove and they were sitting on the other side. Q. What did he say to you? A. He said sign it, and put his finger where he wanted me to sign it and I signed it. Q. What did he do then? A. He handed my husband

the draft and he handed it to me and I laid it in the clock.   Q.   How long did it stay in the clock?   A.   I taken it out when he started off and handed it to him and told him he had better take it and get the money on it.   Q.   When was that?   A.   On Saturday evening.   Q.   Was that all that occurred?   A.   Yes."

On April 15 appellee wrote the following letter to the claim agent: "Bridgeport, Texas, 4-15-03.   Mr. Williams.   Your letter to hand, and contents noted.   Mr. Williams, I am not contending that we did not settle I thaut we settled, and now I will tel you why I thaut we settled, you come to my house and sed, I am glad you are getting alonge so well and then you sed about these words, someone told me I had better be getting over to see Mr. Williams he is lible to suie or something to that effect, then I sed No Mr. Williams all I ask or have sed was that the company ought to pay me for my time and that was all I ask.   So you sed, I came by the doctor and he said you would be able to go to work in 5 or 6 days and then you added and sed I will extend it one week longer to be sure to give you plenty time, then I said again all I want is my time and I dont want to rob a railroad because I could and, this is what I though we settled on was my time so I was not to bother the company for anything only my disablet time you wrote the papers and I and my wife sind them.   When you had gon out thru the gate my wife sed to me, now if you are able to go to work in three weeks you get no more, I sed no, unless I am still unable I have settled with them only for my time so this is the reason I wrote to you, when I saw that I was not going to be able in that time for a watching job as a favor to the company and to sho that I was not trying to get their money for nothing while they were actually dew my time so Mr. Williams I am no man to keep up a disturbance Mr. Williams, I will be at the train Satterday but if the company has drop me other rangements to get it, I worked one hour yesterday and about a couple to-day I wil be honest with you I don't believe I wil be able soon or ever to do a days work by strength as well as my brest is a failure.   Respt, J. M. W."

We think this evidence wholly wanting in that probative force necessary to set aside the formal, absolute discharge executed by appellee. To our minds the evidence leaves no doubt that appellee well understood that he was making a settlement for the damages resulting from the injuries pleaded in this case upon the terms of his being paid a dollar and a half a day for the time lost by him, and that it was likewise then understood that the period of twenty days would be ample time within which appellee would entirely recover.   The difficulty is his recovery from injury was not as then anticipated.   It is well established that voluntary settlements are favored and that "if a doubt or dispute exists between parties with respect to their rights, and all have the same knowledge concerning the circumstances involving those rights, and there is no fraud, misrepresentation, concealment or other misleading incident, a compromise into which they have voluntarily entered must stand and be enforced, although the final issue may be different from that which was anticipated, and although the disposition made by the parties in their agreement may not be that which the court would have decreed, had the controversy been brought before it for decision."   See

the case of Houston & T. C. Ry. Co. v. McCarty, 94 Texas, 301, and authorities therein cited.

It follows, we think, that the judgment must be reversed, and inasmuch as the case has been twice tried with full opportunity for the presentation of all existing testimony relating to the issue, we think in the interest of the litigants that an end should be brought to the case and the judgment be now and here rendered for appellant, and it is so ordered.

In view of appellee's request for additional conclusions, we have considered the assignments not disposed of by our opinion, but find no reversible error presented thereby. This is intended to include the conclusion that the evidence supports an inference of negligence on the part of the operatives of appellant's engine, in not exercising due care to ascertain appellee's dangerous position at the time the coupling was made, and that such negligence was the proximate cause of the injury.

*Reversed and rendered.*

Writ of error refused.